## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

-------------------------------------------------------------------------------

NATIONAL FAIR HOUSING ALLIANCE

               Plaintiff,

     v.

FAIRWINDS RIO RANCHO;

LEISURE CARE, INC.;

ONE EIGHTY TWIST;

               Defendants.

-------------------------------------------------------------------------------

**COMPLAINT**

**Civ. No. 20-458**

Plaintiff, National Fair Housing Alliance, by and through its undersigned counsel, Eisenberg & Baum, LLP, for its Complaint against Defendants, hereby alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff, National Fair Housing Alliance ("NFHA"), is a non-profit organization whose mission is to eliminate housing discrimination and ensure equal housing opportunities throughout the United States. Defendants own and/or operate numerous nursing homes and assisted living residences throughout Utah and nationwide. Defendants refused auxiliary aids and services necessary for effective communication to prospective deaf residents who use American Sign Language. Therefore, Defendants' conduct amounts to disability discrimination.

2.    American Sign Language ("ASL") is a visual, three-dimensional, and non-linear language, and its grammar and syntax differ from those of English and other spoken languages. With its own grammar and syntax, ASL is best thought of as a foreign language used by American deaf people. Deaf individuals are often educated in Deaf schools and grow up in culturally deaf environments. Because of both physical and environmental factors, deaf individuals usually have

1

great difficulty achieving a working command of spoken or written English, while they can communicate complex thoughts and opinions with great ease in ASL. Therefore, most deaf individuals in medical facilities, nursing homes, assisted livings, and/or rehabilitation centers require ASL interpreters when that care involves complicated information and lengthy communications.

3.      NFHA used fair housing testers ("Testers") to monitor Defendants' compliance with the federal anti-discrimination laws and regulations. Testers asked whether Defendants could accommodate Testers' fictitious deaf mother-in-law at Defendants' facilities. Testers specifically asked whether Defendants will provide interpreters to the deaf mother-in-law for medical consultations and other important events at Defendants' facilities. Defendants' representatives or administrators told Testers that they cannot provide interpreters for her and that she must pay for her own interpreters.

4.      A senior living facility deprives deaf individuals' right to effective communication and equal housing opportunity when it fails to provide them an ASL interpreter. Thus, Defendants discriminated against prospective deaf residents by failing and/or refusing to provide them qualified ASL interpreters or other auxiliary aids and services for effective communication.

5.      Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices. Defendants must implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' residential and health care services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3602 *et seq.* and its regulations.

## THE PARTIES

6.     Plaintiff NFHA is a non-profit, civil rights organization with its principal office located at 1331 Pennsylvania Avenue, NW, Suite 650, Washington, DC 20004.

7.     NFHA is dedicated to ending housing discrimination and ensuring equal housing opportunities for all people through leadership, education and outreach, membership services, public policy initiatives, community development, advocacy, and enforcement.

8.     NFHA engages in efforts to resolve and remedy acts of discrimination. Its enforcement efforts are designed to halt violations of the law, provide full and complete compensation to victims of discrimination, and prevent future discriminatory conduct.

9.     As part of NFHA's ongoing monitoring of housing discrimination, it employs individual "Testers" – who pose as prospective renters, home buyers, residents, and the like – to investigate any housing discrimination from local governments, landlords, real estate agents, companies, and others.

10.     NFHA spent significant staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other NFHA activities.

11.     Defendants' discriminatory practices—refusing to provide deaf individuals necessary auxiliary aids and services—made nursing home and assisted living facilities inaccessible to deaf individuals and frustrated NFHA's mission to ensure equal access to housing opportunities for all in New Mexico.

12.     Defendant FAIRWINDS RIO RANCHO is a senior living facility located at 920 Riverview Drive Southeast, Rio Rancho, New Mexico 87124. Defendant is subject to the requirements of the Fair Housing Act.

13.     Defendant LEISURE CARE, INC. is a corporation which owns, oversees, and/or operates a chain of retirement and assisted living communities including FAIRWINDS RIO RANCHO. It is located in 1601 5th Avenue Suite 1900 Seattle, WA 98101. Defendant is subject to the requirements of the Fair Housing Act.

14.     Defendant ONE EIGHTY TWIST is a Parent Company of LEISURE CARE, INC. which owns, oversees, and/or operates senior housing facilities. It is located in 1601 Fifth Avenue, Suite 1900, Seattle, WA 98101. Defendant is subject to the requirements of the Fair Housing Act.

## JURISDICTION & VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under federal law, as well as 42 U.S.C. §3613(a) with respect to claims arising under the Fair Housing Act.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or the Defendants have sufficient contacts with this District to subject them to personal jurisdiction at the time this action is commenced.

## STATEMENT OF FACTS

17.     Some background on Deaf[1] culture is necessary to understand the balance of this case. American Sign Language, "the sixth most commonly used language in this country," is not a gestured form of English. "ASL is a mix of native signs and French sign language. Some words are finger-spelled, borrowed from English the same way that the words gourmet, roulette, and taco

---

[1] "[T]he word deaf is written with either an uppercase or lower-case 'D.' When referring to the audiological condition of deafened people, deaf is written with a lower-case 'd.' An uppercase 'D' is used when writing about the Deaf culture, a group with which many prelingually deaf people affiliate themselves." D. Scheier, Barriers to Health Care for People with Hearing Loss: A Review of Literature, Journal of the New York State Nurses Association at 4, https://bit.ly/2QYg8T6.

are borrowed from French and Spanish." And the native signs derive from "hand shape, palm direction, placement of the hand on the body or within the signing space, movement, and non-manuals (facial expressions)." D. Scheier, *Barriers to Health Care for People with Hearing Loss: A Review of Literature*, Journal of the New York State Nurses Association at 6, https://bit.ly/2QYg8T6 (internal citations omitted). In other words, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.*

18.     Due to physical, environmental, and pedagogical factors, many deaf individuals have difficulty acquiring English. Indeed, the majority of prelingually deaf individuals are not fluent in English, and the median reading level of deaf high school graduates is fourth grade. *See* Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge?,* 26 Ariz. St. L.J. 163, 180 n. 113 (1994). This is because many deaf people acquire English as their second language later in life—after ASL or another form of sign language—and well past the critical developmental period of language acquisition. *See People v. Ripic*, 587 N.Y.S.2d 776, 783 (N.Y. App. Div. 1992) ("Written English is often incomprehensible to deaf individuals whose primary language is American Sign Language.").

19.     Nor can deaf individuals communicate effectively by reading a person's lips. Lip-reading or speech-reading—the ability to understand the speech of another by watching the speaker's lips—does not provide effective communication for deaf and hard of hearing individuals. *See* Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WISC. L.REV. 843, 855 (2003) In fact, the upper limits of estimates for lip-

reading accuracy have been as low as 10% to 30% of words correct. *See* Lynne E. Bernstein & Edward T. Auer, *Speech Perception and Spoken Word Recognition*, *in* Oxford Handbook Of Deaf Studies, Language, And Education 399, 402 (Mark Marschark & Patricia E. Spencer eds., 2d ed. 2011) (citation omitted). This is because only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language or the speaker's vocabulary, for the reasons set forth above. *See* LaVigne & Vernon, *supra*, at 857 ("Simply put, many deaf people do not understand the words we are using, even if the words are put into a visible form by writing or finger-spelling.").

20.     Thus, "[t]o deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language. *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017).

21.     Effective communication is especially important in health care settings because "it is primarily through language that the physician works to establish rapport and trust. Good physician-patient communication is fundamental to good health care." E. McEwen & H. Anton-Culver, Journal of Family Practice, Vol. 26, No. 3:289–291, 291 (1988), https://bit.ly/2Fn3zLW. Unfortunately, "many physicians are reportedly unaware of Deaf culture and the health needs of deaf people. This may lead to assumptions and misconceptions about deafness that undermine professional health care. For example, practitioners often believe that lip reading/speech reading and note writing provide effective health communication. In reality, these are ineffective communication modalities for health care conversations. Deaf people who have practiced lip-reading/speech-reading for many years and who are familiar with spoken language are able to

understand at best 30-45% of spoken English. Furthermore, note-writing is often constrained by deficits in health literacy and limited 'fund of information' deficits." A. Kuenburg, P. Fellinger, & J. Fellinger, Health Care Access Among Deaf People, Journal of Deaf Studies and Deaf Education, 2016, Vol. 21, No. 1:1–10, 2 (internal citations omitted), https://bit.ly/39GAPeZ.

<u>Facts surrounding the NFHA Testing</u>

22.     From October 16, 2018, NFHA investigated several nursing home facilities in New Mexico, including those of the Defendants. The investigation used Testers to make telephone calls and on-site visits to Defendants' facilities. Operating under aliases, Testers posed as family members of elderly deaf individuals seeking a residence at Defendants' nursing home/assisted living facilities. NFHA instructed Testers to tell Defendants' representatives that Testers' deaf mother-in law primarily uses ASL and that she cannot read, write, or lip-read. NFHA also instructed Testers to ask Defendants whether Defendants' facilities will provide an ASL interpreter for the mother-in-law for on-site medical assessments and other important events. Testers also explained Defendants that the mother-in-law will not need interpreting services on a daily basis, but only for important events.

23.     All contacts between Testers and Defendants' representatives were audio recorded and transcribed.

<u>Factual Allegations Regarding Fairwinds Rio Rancho</u>

24.     On October 23, 2018, Testers M.H. and L.A. visited Defendants' facility, Fairwinds Rio Rancho. Defendants' marketer, Sharon, gave a facility tour for Testers. Testers informed Sharon that their mother-in-law was born deaf, and she only communicates using ASL. Sharon asked whether Testers' mother-in-law can read lips or read a menu, and Testers replied that she cannot. Sharon informed Testers that residents are responsible for picking out their meals, so it would be problematic that their mother-in-law cannot read lips. Testers told Sharon that they are

confident that their mother-in-law could manage daily tasks using body language and gestures, but an ASL interpreter is needed for important events, such as medical consultations and special activities within the facility. Sharon suggested that Testers seek a referral service to find a living facility that fits their mother-in-law's needs. Sharon further stated that she had not encountered a situation where she needed to provide accommodations for a deaf individual before, and that the deaf resident who currently resides in Defendants' facilities can read lips.

25.     On October 24, 2018, Sharon informed Tester M.H. that she contacted the Community Outreach Program for the Deaf, which would incur costs for each visit. Sharon further stated that she discussed the matter with the facility's nurse and general manager who determined that the facility would not pay for interpreting services for Testers' mother-in-law.

Diversion of Resources and Frustration of Mission

26.     Defendants' discriminatory practices have frustrated and continue to frustrate NFHA's mission of eliminating housing discrimination and ensuring equal housing opportunities for all in New Mexico and throughout the country. Specifically, Defendants' discriminatory policies and practices alleged in this Complaint frustrate NFHA's mission because they violate federal anti-discrimination laws, undermine rather than advance equal housing opportunities, perpetuate the harms of disability discrimination, and prevent people with disabilities from fully and equally enjoying, participating in, and benefitting from Defendants' residential and health care services.

27.     Over the past several years, and prior to the filing of this Complaint, NFHA has diverted its scarce resources and staff from other activities to investigate and counteract Defendants' disability discrimination. In doing so, NFHA had to go beyond its normal operations. For example, NFHA directly outreached to New Mexico residents and facilities (including through mailings and educational flyers) regarding the housing rights of deaf and hard of hearing

individuals in assisted living facilities. This targeted, localized, and direct outreach required specific expenditures that were distinct from NFHA's everyday operations, which are usually national in scope and designed to have a broader focus.

28.     NFHA diverted considerable resources and staff time to conduct the testing, which included, preparing and planning multiple trainings for its staff and testers; conducting numerous internal and external meetings; researching and planning the testing; identifying the nature and scope of the testing; drafting and designing testing materials; documenting the testing progress and results; transcribing the audio recordings of the testing; travel time and expenses; and significant staff hours diverted from other work to conduct these testing activities.

29.     In addition, NFHA has engaged in various community outreach and public education campaigns to counteract and to raise awareness of the discriminatory practices among senior living facilities. For example:

      a.  In March 2020, NFHA ran a series of four social media posts to educate the public about fair housing laws regarding senior housing providers, including assisted living facilities and nursing homes. This content, shared on NFHA's Facebook (two posts), Twitter (one post), and Instagram page (one post), included a mixture of text, graphics, and video clips. Each post provided a link to NFHA's dedicated web page that has numerous resources related to discrimination against deaf and hard of hearing individuals in senior living facilities. These posts generated thousands of impressions (views) across social media platforms.

      b.  In December 2019, NFHA staff members mailed an educational letter and flyers to assisted living facilities, senior placement services, government agencies,

hospitals and libraries, schools, non-profits, senior centers, and interpretation and relay service organizations in the metro areas of Santa Fe, New Mexico. The mailing was sent to 30 assisted living facilities, 3 senior placement services, 5 government agencies, 1 school, 2 non-profit organizations, and 11 senior centers. NFHA solicited an advertising agency's assistance in creating a public service announcement ("PSA") that was designed to educate the public about fair housing laws for individuals who are deaf or hard of hearing, especially those living in an assisted living facility. At least one printed PSA was sent with each mailing. Each mailing also included one printed copy of NFHA's Brochure titled "Fair Housing Rights of Persons Who Are Deaf or Hard of Hearing or Who Are Blind or Have Low Vision" and one printed copy of NFHA's Flyer titled "The Fair Housing Act Prohibits Discrimination Against Those Who Are Deaf or Hard of Hearing."

c.  In September 2019, NFHA added educational information to its website, along with links to local fair housing centers, the Department of Housing and Urban Development, and the National Association of the Deaf, specifically designed to educating the general public about fair housing laws regarding senior housing providers, including assisted living facilities and nursing homes. The educational information includes three fair housing videos presented in American Sign Language with English subtitles. The content remains on NFHA's website to date. *See* National Fair Housing Alliance, *Discrimination Against Deaf and Hard of Hearing Individuals in Senior Living Facilities*, https://nationalfairhousing.org/discrimination-against-deaf-and-hard-of-

hearing-individuals-in-senior-living-facilities/ (last accessed April 2, 2020)

d. In March 2019, NFHA conducted meetings with several groups in Albuquerque, New Mexico, to discuss housing discrimination against deaf and hard of hearing individuals in assisted living facilities in the metro area and their rights under the Fair Housing Act. NFHA provided education and outreach material to be share with their clients/audiences.

e. In February 2019, NFHA had a discussion with a local group in Albuquerque, New Mexico to discuss housing discrimination against deaf and hard of hearing individuals in assisted living facilities. The parties also discussed about groups in Albuquerque that serve deaf and hard of hearing individuals, who may face discrimination and need information about fair housing rights.

30. Each of these activities required the diversion and expenditure of financial resources and staff time, which included, researching and planning the activities; conducting numerous internal and external meetings; drafting and designing educational materials; producing videos and graphic design; mailing and traveling; and significant staff hours diverted from other work to conduct these outreach activities.

## COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT

31. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

32. This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et seq.

33. Defendants own and/or lease dwellings within the meaning of U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

34. The FHA provides that it is illegal "to discriminate against any person in the terms,

conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

35.     Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

36.     Under the FHA, it is unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

37.     Plaintiff's Testers, on behalf of their fictitious deaf family member, requested and were denied the reasonable accommodation of having a qualified ASL interpreter, and thus, were denied access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

38.     Defendants discriminated on the basis of disability, in violation of the above-cited provisions of the FHA.

39.     Defendants violated the FHA by, inter alia, denying Plaintiff's Testers' requests for the provision of a qualified sign-language interpreter and thereby denying their fictitious deaf family members, on whose behalf the Testers were inquiring, access to services, programs or activities provided by Defendants in connection to their facilities. Defendants violated the FHA by, inter alia, adopting, stating, and advertising their policy or practice of refusing to provide qualified sign-language interpreters to any person requesting such accommodations in order to

reside at Defendants' facilities.

40.     Upon information and belief, Defendants' refusal to offer ASL interpreter services is the result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the right of a deaf individual to have an equal opportunity to benefit from Defendants' services.

41.     Regardless of whether the statements made by Defendants were intended to indicate any preference, limitation, or discrimination based on disability, an ordinary listener would understand their statements to indicate a limitation, preference, or discrimination because of the disability of the proposed occupants. These statements were made in the course of advertising and marketing the Defendants' dwelling units to potential applicants. They had the effect of infringing on the rights of people with disabilities.

42.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

43.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA, 42 U.S.C. § 3613(c).

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief:

a.     Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have discriminated in violation of The Fair Housing Act ("FHA"), 42 U.S.C. § 3602.

b.     Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

c.   Order Defendants:

    i.   to develop, implement, promulgate, and comply with a policy prohibiting future discrimination of failing to provide effective communication against deaf or hard of hearing individuals;

    ii.   to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an onsite interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

    iii.   to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

    iv.   to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances;

    v.   to create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

    vi.   to train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the FHA;

    vii.   to train all their employees, staff, and other agents on a regular basis about Defendants' policy regarding how to obtain interpreters when reasonably

requested by deaf or hard of hearing individuals; and

    viii.    to implement a program of testing Defendants' employees, staff, and other agents to determine whether they are complying with the requirements of the FHA.

d.  Award to Plaintiff:

    i.    Compensatory damages pursuant to the FHA;

    ii.    Punitive damages pursuant to the FHA;

    iii.    Reasonable costs and attorneys' fees pursuant to the FHA;

    iv.    Interest on all amounts at the highest rates and from the earliest dates allowed by law;

    v.    Any and all other relief that this Court finds necessary and appropriate.

Dated: May 13, 2020

Respectfully submitted,

By:

Andrew Rozynski, Esq.
Eric Baum *
EISENBERG & BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
Main: (212) 353-8700
Fax: (212) 353-1708
Email: arozynski@eandblaw.com
    ebaum@eandblaw.com

Morgan Williams*
NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue, NW, Suite 650
Washington, DC 20004
Main: (202) 898-1661

Email: mwilliams@nationalfairhousing.org

*Attorneys for Plaintiff*

\**pro hac vice* application to be filed